**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| KIMBERLY BOUTIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-0322 |
| | § | |
| EXXON MOBIL CORP., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This is an employment discrimination case. The defendants are Jacobs Field Services North America, Inc. and ExxonMobil Corporation. The plaintiff, Kimberly Boutin, was an employee of Jacobs Field Services, which had a services contract at an ExxonMobil chemical plant. Boutin alleges that Jacobs and ExxonMobil fired her from her job with Jacobs at the ExxonMobil plant because of her sex and in retaliation for complaining about sexual harassment at work. The defendants deny any discrimination and assert that Jacobs fired Boutin after marijuana was found in her car during a routine search for contraband, which, as a matter of policy, required her to be barred from the plant premises. The defendants have moved for summary judgment. (Docket Entry Nos. 26, 45). Both defendants argue that there is insufficient evidence to create a fact issue on all three of Boutin's claims. ExxonMobil also argues that it cannot be liable as a matter of law because it was not Boutin's employer. Boutin has responded to both motions, arguing that the record creates disputed fact issues material to liability and that ExxonMobil and Jacobs were her "joint employers." (Docket Entry Nos. 43, 47). Both defendants have replied. (Docket Entry Nos. 44, 52). Based on the motions, responses, and replies; the summary judgment record; and the applicable law, this court

grants both defendants' motions for summary judgment.  Final judgment is entered by separate order.  The reasons are explained in detail below.

## I.      Background

### A.      Boutin's Work for Jacobs

In 2003, Kimberly Boutin began working for Jacobs Field Service North America, a company that contracts to provide services to industrial plants in the Texas Gulf Coast region.  One of the plants Jacobs contracted to serve was the Mount Belvieu Plastics Plant (the "MBPP") owned by the ExxonMobil Corporation.  The MBPP is a chemical facility that produces polyetheyne.  The contract between Jacobs and ExxonMobil stated that Jacobs is "an independent contractor controlling and supervising its personnel and equipment used" in performing the contract.  (Docket Entry No. 26, Ex. 2, Smith Decl., Ex. A at 2).  The contract also stated that ExxonMobil has the right to request that any Jacobs employee be removed from the MBPP for any reason, so long as it is "in compliance with applicable law."  (*Id.* at 7).

According to Kendra Smith, the Human Resources Manager for ExxonMobil at the MBPP while Boutin worked there, ExxonMobil had a written policy prohibiting "possess[ion] of controlled substances" in the workplace.  (*Id.*, Ex. 2, Smith Decl., ¶ 11).  She stated that ExxonMobil also required its "contractors to implement their own contraband policies."  (*Id.,* ¶ 10).  Indeed, ExxonMobil gave contractors specific minimum requirements for these policies. Contractors were required to prohibit their personnel from, among other things:

> A.    Using, possessing, selling, manufacturing, distributing, concealing, or transporting while on or handling ExxonMobil Property or during performance of Third-Party Services any of the following items:
> I.    Any Prohibited Substance including full or empty alcoholic beverage containers;

> ii.    Contraband, including firearms, ammunition, explosives, weapons and cameras (with or without film);
>
> iii.    Illicit drug equipment or paraphernalia

(*Id.*, Ex. 2, Smith Decl., Ex. D).  The written policy also stated that ExxonMobil may conduct searches of a contractor's employees' property or persons at any time, including with scent-trained dogs.  (*Id.*).  "Any Contractor Personnel found in violation of Contractor's Policy or who refuses to cooperate with the searches and tests included in Contractor's Policy shall be permanently removed by Contractor from ExxonMobil Property and from performing work for ExxonMobil." (*Id.*).  ExxonMobil also developed and documented a standardized set of actions it would take in the event that a contractor's employee was found to have violated any premises rules.  (*Id.*, Ex. 2, ¶ 11).  This document stated that if a contractor's employee was found to be in possession of illegal drugs, he or she would be denied "future access to all ExxonMobil sites" after only one such incident.  (*Id.*, Ex. 2, Smith Decl., Ex. E at 2).  This zero-tolerance approach was in contrast to other violations, which were addressed with progressive discipline.  An employee found to have a firearm or ammunition would be denied access to all ExxonMobil sites for three workdays on the first infraction and denied access permanently on the second infraction.  (*Id.* at 4).

Jacobs had its own written policies and disciplinary guidelines.  Drug possession "on company premises" would result in discharge upon the first offense, as would "[p]ossession of illegal weapons or firearms on company premises."  (Docket Entry No. 47, Ex. 20).

It is undisputed that Boutin was subject to the ExxonMobil contractor policies while working at the MBPP.  Jacobs disputes that its own policies applied because the MBPP was not Jacobs's "premises."

Boutin began working at the MBPP in the Packaging and Shipping Department, where she held two different positions. (Docket Entry No. 45, Ex. 6, Pettus Decl., ¶ 4; Docket Entry No. 47, Ex. 3, Boutin Depo. at 23). In late 2006, Boutin applied for the Catalyst Yardmaster job in the MBPP's Catalyst Unit. Tom Pettus, Jacobs's on-site manager at the MBPP, and Kris Fields, ExxonMobil's "first line supervisor," interviewed and selected Boutin for the position. Pettus stated that it was his decision. Boutin testified in her deposition that Pettus told her that he decided to hire her for the job in consultation with Fields. Pettus recalled that there were "approximately" five other applicants for the position, four of whom were men. The previous Catalyst Yardmaster was a man. (Docket Entry No. 45, Ex. 6, Pettus Decl., ¶ 5; Docket Entry No. 47, Ex. 3, Boutin Depo. at 24-25).

Jacobs was Boutin's employer for all three of the positions she held at the MBPP. ExxonMobil did not issue her paychecks, pay payroll taxes for her employment, or provide her any benefits. Boutin worked a different schedule than ExxonMobil employees and had different vacation allocations. (Docket Entry No. 26, Ex. 2, Smith Decl., ¶ 4; Ex. 1, Boutin Depo. at 96, 131-33). ExxonMobil did have some supervisory role in Boutin's work. Although Boutin's vacation requests were signed by Jacobs personnel, she testified in her deposition that she would also have to clear her chosen vacation dates with ExxonMobil because "[i]n catalyst, you don't have a backup." (*Id.*, Ex. 1, Boutin Depo. at 139-40).

**B.     Boutin's Allegations of Sexual Harassment**

Boutin began working as Catalyst Yardmaster in October 2006. That same month, she began having problems with an ExxonMobil employee, George Dorsey. Boutin claims that when Dorsey gave her a tour of the Catalyst Department, he told her that she was required to perform duties that she felt were outside her job description. After she made this clear to Dorsey, she claims that he

4

yelled at her.  (Docket Entry No. 26, Ex. 1, Boutin Depo. at 27-29 & Ex. 5).  Later that same day, Boutin claims that Dorsey moved some portable tanks, blocking a path that Boutin had cleared for unloading a truck that was set to arrive.  Boutin testified in her deposition that this "didn't mess up my timing because I went out there and double-checked it and moved them."  (*Id.* at 32).  According to Boutin, when the truck arrived, Dorsey made snide remarks to her in front of the driver and told the driver that he was teaching Boutin how to do her job.  (*Id.* at 31).

Boutin claims that on November 7, 2006, when a truck arrived to deliver cargo that she was supposed to unload, Dorsey could not find her and unloaded the truck himself.  Dorsey was not qualified to sign the bill of lading and he asked Karen Adams, ExxonMobil's supply-chain coordinator, to ensure that the paperwork was completed.  Boutin testified in her deposition that although she was the only one qualified to sign for the shipment, when Adams asked her to do so, she instead suggested that Dorsey sign the bill of lading because he had unloaded the truck.  Boutin claims that Dorsey responded by saying: "[J]ust sign it and get this man on the road.  It don't take an act of Congress to get this done."  (*Id.*, Ex. 1, Boutin Depo. at 33-35, 134 & Ex. 5).

Boutin asserts that another incident with Dorsey occurred on February 8, 2007.  Dorsey was working on a hose filled with pressurized nitrogen, or catalyst.  He released the nitrogen in a series of bursts that created dust clouds.  These dust clouds drifted upward to a platform where Boutin was standing.  Boutin could not escape the area and covered her face with her shirt and stepped to the rear part of the platform to avoid the dust.  Boutin claims that this last incident was intentional.  She testified in her deposition that Dorsey looked at her and continued to blow the catalyst in her direction, and that he could have shut off the valve at any time.  (*Id.* at 35-37; Docket Entry No. 45, Ex 4, Dorsey Decl., ¶ 7).  Dorsey stated in his declaration that he "depressured the lines in a series

of slow releases to minimize any dust clouds that would result" and than he did not wear a respirator while doing so.  (Docket Entry No. 45, Ex. 4, Dorsey Decl., ¶ 7).

Boutin reported this incident to Pettus; to the Jacobs safety manager, Josh Lesher;  to the Jacobs trainer, Katie Belcher; to ExxonMobil's Karen Adams; and to ExxonMobil supervisor Bill Gifford.  Boutin also documented the incident in a shipping-and-receiving log.  (Docket Entry No. 26, Ex. 1, Boutin Depo. at 35-38).  Pettus in turn informed Karen Ratcliff, the ExxonMobil superintendent in charge of the catalyst unit, who responded—as Pettus paraphrased it—that she had "already spoken with Ms. Boutin and had referred the complaint to ExxonMobil's Human Resources office for investigation."  (Docket Entry No. 45, Ex. 6, Pettus Decl., ¶ 7).

ExxonMobil investigated the February 2007 incident.  The investigation was led by Kendra Smith, the Jacobs Human Resources Manager.  Smith interviewed Boutin, Dorsey, and others.  She also reviewed a handwritten narrative from Boutin.  This narrative did not mention any sex-based comments made by Dorsey.  In the interview, however, Boutin told Smith that Dorsey had said that "women should be at home" and "not out here working in a plant environment."  Boutin stated that she was "not offended by these comments."  (Docket Entry No. 26, Ex. 2, Smith Decl., Ex. C).  Pettus, Jacobs's on-site supervisor, contacted Ratliff three times to keep in touch with the status of the investigation.  (Docket Entry No. 47, Ex. 7, Pettus Depo. at 26-29).  Eleven days after the nitrogen incident, on February 19, 2007, Smith prepared a report describing her investigation.  On April 13, 2007, ExxonMobil issued Dorsey a written reprimand and placed him on probation.  (Docket Entry No. 26, Ex. 2, Smith Decl., ¶¶ 7-8).

Smith testified that she did not receive any further complaints from Boutin and was not aware that anyone else did.  (*Id.*, ¶ 9).  In her deposition, however, Boutin identified additional

instances of harassment.  She testified that six or seven times, both before and after her complaint

in February 2007, she heard Dorsey tell other people that "[a] woman is supposed to be at home

having babies."  (*Id.*, Ex. 1, Boutin Depo. at 45-46).  Twice after Boutin complained, she heard

Dorsey tell other men that Boutin was "taking food out of another man's family's mouth."  (*Id.* at

43-44).  Boutin also heard, "[p]robably in '07," Dorsey say six or seven times that lifting heavy

objects "was a man's job."  (*Id.* at 45, 47-49).  Boutin estimated that about twice a week after she

had complained, Dorsey commented loudly to anyone who would listen that he had been punished

for his religious beliefs about women.  (*Id.* at 65-66).  Boutin testified that near the end of 2007,

Dorsey tried to make her job more difficult by refusing to move a tank loaded with catalyst.  Boutin

testified that she was working past the time her shift usually ended to complete a particular project

when Dorsey called Boutin on the radio to ask her to move the tank that he had just loaded.  Boutin

refused, saying that she was still at work only to finish a specific project.  She told Dorsey to move

it himself, just as he would on any other day at that time.  Dorsey did not move the tank and it sat

outside overnight.  Boutin told Bill Gifford about this incident who, after confirming that it was not

Boutin's responsibility to move the tank, told her to "leave it alone."  (*Id.* at 50-52).  Boutin also

testified that on two occasions, labels that she placed on portable tanks were removed.  She

suspected that Dorsey was responsible for removing the labels and complained to Karen Adams.

These two events occurred in July or August 2007 and November 2007.  (*Id.* at 53-56).  Finally,

Boutin alleged that Dorsey once ignored a request she made on the radio for him to help her, when

plant protocol required that he do so.  She testified that Dorsey instead went on the radio and asked

other people if they needed help.  The date of this incident is unclear.  (*Id.* at 41).

### C.    The Contraband Search and Boutin's Job Termination

On January 29, 2008, ExxonMobil conducted a search for contraband at the MBPP. According to Ernie Davis, an Operations Section Supervisor of ExxonMobil at the MBPP, the search was conducted because a major maintenance operation known as a "turnaround" was underway at the plant. The turnaround required additional contractors at the MBPP. ExxonMobil wanted to "enforce its contraband policy and deter these contractors from bringing prohibited items into the plant." (Docket Entry No. 45, Ex. 3, Davis Decl., ¶ 4). ExxonMobil hired Interquest Detection Canines to search the entire plant complex, including the parking lots and vehicles entering the lots, with scent-trained dogs. (*Id.*). On January 29, one of the dogs alerted on the car Boutin had parked in the lot. Boutin was called and confirmed that she owned the car. The car was a Chevy Malibu that was no longer operational but that ExxonMobil had allowed Boutin to leave in the lot. She unlocked the car at Interquest's request. Interquest found two marijuana seeds and a marijuana bud inside. Interquest informed Davis that the substance found was marijuana. Davis was present for the search. (*Id.*, ¶¶ 5-7 & Ex. A). Davis informed Pettus that, based on the information from Interquest, "Boutin was barred from ExxonMobil's premises." (*Id.*, ¶ 8). Davis stated in his declaration that "[t]he only reason I determined that Ms. Boutin should be barred from ExxonMobil's premises is because the Company guidelines required it." (*Id.*, ¶ 10). Davis stated that he was unaware that Boutin had ever made any complaints against or had any issues with Dorsey. Davis never spoke to Dorsey or Smith about Boutin. (*Id.*, ¶ 11).

After Davis informed Pettus that Boutin was barred, Pettus contacted Billy Roberts, the off-site Human Resources Manager for Jacobs, to discuss the appropriate course of action. Pettus decided that Boutin's employment should be terminated because, without access to the MBPP, she "could no longer perform her job." (*Id.*, Ex. 6, Pettus Decl., ¶ 11). According to Pettus, Roberts told

him that "because Ms. Boutin had possessed marijuana at the workplace, her termination would have to be characterized as a violation of company policy."  (*Id*, ¶ 11).  Pettus stated in his declaration that he fired Boutin because the marijuana was found in her car, that neither "gender nor her complaints about Mr. Dorsey played any part," and that Dorsey had no role in the decision.  (*Id*, ¶ 12).

After Boutin was fired, Pettus interviewed two male candidates and one female candidate for the Catalayst Yardmaster position.  He selected the female candidate.  (*Id.*, ¶ 13).

On the same day Boutin's car was searched, dogs alerted at other cars containing prescription and over-the-counter drugs, both of which are contraband unless the employee is authorized to have them.  Alcohol was found in other cars.  Dogs also alerted at some cars for no apparent reason. Marijuana was found in two other vehicles.  One belonged to a male employee of another contractor. This employee was also barred from the MBPP premises.  The other vehicle belonged to a male ExxonMobil employee.  He was subject to different policies because he was not a contractor employee.  (*Id.*, Ex. 3, Davis Decl., ¶ 9).  He was placed on suspension and later fired a short time later, after he refused to take a drug text.  (Docket Entry No. 47, Ex.15).  During the search, a loaded gun and ammunition was found in a car owned by a Jacobs employee with the initials K.A..  (*Id.*, Ex. 13).  K.A., who is male, was suspended from work for three days but was not fired.  Boutin testified that shotgun shells were found in vehicles owned by two other male Jacobs employees who she did not believe were disciplined.  (*Id.*, Ex. 3, Boutin Depo. at 109-10).

### D.     The Lawsuit

Boutin filed an EEOC charge of discrimination against both Jacobs and ExxonMobil on February 15, 2008.  She checked the boxes for retaliation and discrimination based on sex.  (*Id.*, Ex.

21).  Boutin filed suit on February 4, 2009, alleging that both Jacobs and ExxonMobil were liable

for a sexually hostile work environment, sex discrimination, and retaliation under Title VII. She

alleged that she was fired because of her sex and in retaliation for her complaints about harassment.

(Docket Entry No. 1).

Jacobs and ExxonMobil have both moved for summary judgment.  (Docket Entry Nos. 26,

45).  Both defendants argue that the alleged sexual harassment was not severe or pervasive; that

Boutin's claim for much of the alleged conduct is time-barred; and that they responded to her

complaints appropriately.  On the discrimination and retaliation claims, they argue that there is no

evidence that Boutin was fired for any reason other than her violation of the written policy.

ExxonMobil also argues that the claims against it should be dismissed because it was not Boutin's

employer.

Boutin has responded to both motions.  (Docket Entry Nos. 43, 47).  She argues that

ExxonMobil was her joint employer and contests both defendants' arguments that the record is

insufficient to create factual issues.  On the discriminatory and retaliatory termination claims, Boutin

urges disparate discipline as the basis for a disputed fact issue.  She focuses on K.A., arguing that

he was allowed to keep his job after being found with a loaded gun because he was male and had

not complained.  The defendants have replied.  (Docket Entry Nos. 44, 52).

Both motions and Boutin's responses are analyzed below in light of the record evidence and

the applicable law.

## II.    The Applicable Law

Summary judgment is appropriate if no genuine issue of material fact exists and the moving

party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the

burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### III.    Jacobs's Motion for Summary Judgment

### A.    Hostile Work Environment

The Supreme Court has held that a hostile work environment claim arises when racial or sexual harassment is so severe and prolonged that it affects a term, condition, or privilege of employment. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64-67, 106 S. Ct. 2399 (1986); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-23, 114 S. Ct. 367 (1993).   The *prima facie* elements of a hostile work environment claim are that: (1) the plaintiff belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known of the harassment, yet failed to take prompt remedial action.  *Felton v. Polles,* 315 F.3d 470, 484 (5th Cir. 2002).

For harassment to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir. 2002) (internal quotation marks and citation omitted); *Watkins v. Texas Dept. of Criminal Justice*, 269 F.App'x. 457, 463-464 (5th Cir. 2008) (per curiam) (unpublished).  The Supreme Court has explained that courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance."  *Harris,* 510 U.S. at 23.  "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so."  *Harvill v. Westward Communications LLC*, 433 F.3d 428, 434 (5th Cir. 2005) (quoting *Shepherd*

*v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999) (quotation marks omitted)).  The Supreme Court has repeatedly stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

As an initial matter, instances of harassment that are either time-barred or not based on sex must be identified.  *See, e.g., Stewart v. Miss. Transportation Commission*, 586 F.3d 321, 330 (5th Cir. 2009) ("Because any pre-October 2004 harassment cannot constitute a continuing violation in conjunction with the alleged 2006 harassment, Stewart may rely only upon Loftin's 2006 conduct to prove a hostile work environment."); *Baker v. FedEx Ground Package Sys. Inc.*, 278 F.App'x 322, 329 (5th Cir. 2008) (per curiam) (unpublished) ("The phrases 'fired girl walking' and 'stupid' are not 'based on race' and, thereby, do not sustain a race-based hostile work environment claim."); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *abrogated on other grounds by Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405 (2006) ("Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted."); *Vallecillo v. U.S. Dept. of Housing & Urban Devel.*, 155 F.App'x 764, 767-68 (5th Cir. 2005) (per curiam) (unpublished) (filtering out statements that were not based on race or national origin before determining whether the harassment was severe or pervasive).

Because Title VII bars recovery for acts occurring more than 300 days before the plaintiff files a discrimination charge, any harassment that occurred before April 21, 2007 does not provide a basis for relief.  *See* 42 U.S.C. § 2000e-5(e)(1); *Frank v. Xerox Corp.*, 347 F.3d 130, 136 (5th Cir.

2003). Boutin has not responded to Jacobs's limitations argument. Even if she had, the continuing violation doctrine would not apply here because an employer's intervening action "will sever the acts that preceded it from those subsequent to it." *Stewart*, 586 F.3d at 328. Dorsey was reprimanded on April 13, 2007, just one week before the 300-day period began.

Any claim based on conduct that occurred before April 2007 is barred by limitations. Even if it was not barred, none of the conduct that formed the basis for Boutin's complaint in February 2007 can support her hostile work environment claim because Jacobs took prompt remedial action to address Boutin's complaint about this conduct. *See Stewart*, 586 F.3d at 329. Pettus reported Boutin's complaint immediately to ExxonMobil, Dorsey's employer. Pettus stayed in contact with ExxonMobil as it investigated, issued a report within 11 days of Boutin's claim, and, within two months, reprimanded Dorsey and placed him on probation.

Even within the limitations period, some of Dorsey's conduct is not actionable. Even assuming that the evidence raises a fact issue as to whether the conduct was based on sex, Boutin's claim that Dorsey may have removed two labels she had placed on containers and failed to respond to a radio call for assistance are largely based on Boutin's speculation. The remaining evidence of harassment is a series of comments Dorsey made to other people that Boutin overheard. The evidence is that six or seven times, both before and after Boutin's complaint about Dorsey in February 2007, she heard Dorsey tell other people that "a woman is supposed to be at home having babies." (*Id.*, Ex. 1, Boutin Depo. at 45-46). Twice after Boutin complained, she heard Dorsey tell other men that Boutin was "taking food out of another man's family's mouth." (*Id.* at 43-44). She also heard, "[p]robably in '07," Dorsey say six or seven times that lifting heavy objects "was a man's job." (*Id.* at 45, 47-49). Boutin also estimates that twice a week after she complained, Dorsey

14

commented loudly to anyone who would listen that he had been punished for his religious beliefs about women.  (*Id.* at 65-66).

Such "second-hand" harassment carries less evidentiary weight in a hostile work environment case than actions or remarks that are directed at the plaintiff herself.  *See Johnson v. TCB Const. Co., Inc.*, 334 F.App'x 666, 671 (5th Cir. 2009) (per curiam) (unpublished); *see also, e.g.*, *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005) (stating that "second-hand harassment," although relevant, carries less weight than remarks or actions directed at the plaintiff); *Jennings v. Univ. of N.C.*, 444 F.3d 255, 272 (4th Cir. 2006) (same); *McKenzie v. Milwaukee County*, 381 F.3d 619, 624–25 (7th Cir. 2004) (holding that the plaintiff's hostile work environment claim failed because many of the incidents complained of were not directed toward her); *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759–60 (8th Cir. 2004) (holding that the plaintiff had failed to present sufficient evidence that the harassment was severe because the alleged comments were not directed toward him, did not refer to him, and in some instances were merely overheard by him); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (the fact that most of the comments were not directed at the plaintiff contributed to the conclusion that the evidence was insufficient to show a hostile work environment).

Title VII bars "conduct that is so severe and pervasive that it destroys a protected class member's opportunity to succeed in the workplace."  Conduct that "sporadically wounds or offends but does not hinder [an] employee's performance" is not actionable.  *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996); *see also Shepard v. Comptroller Public of Accounts*, 168 F.3d 871, 874 (5th Cir. 1999).  The legal standard requires proof of severe or pervasive conduct that can be characterized as "extreme."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  The

case law on when workplace comments give rise to a hostile work environment claim supports the conclusion that the nature, frequency, and target of the remarks Dorsey made do not raise a fact issue as to whether he sexually harassed Boutin. *Compare Tademy v. Union Pacific Corp.*, 520 F.3d 1149 (10th Cir. 2008) (finding a fact issue on hostile work environment based on evidence of various graffiti and cartoons combined with the words "nigger," "nigger go home," and "hang all niggers and jews" were etched on the employee's locker and the employee found a life-sized noose hanging in the workplace), *with Baker v. FedEx Ground Package System, Inc.*, 278 Fed. App'x 322, 329 (5th Cir. 2008) (*s*upervisor's comments to African-American employee that "she did not want to work with people like" the plaintiff employee and that "whites rule" were not sufficiently severe to survive summary judgment on a race-based hostile work environment claim); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337 (5th Cir. 2007) (holding that a supervisor's infrequent and isolated comments directed to the plaintiff about "ghetto children" and other racially insensitive remarks did not create a fact issue as to whether there was severe or pervasive harassment); *Septimus v. Univ. of Houston*, 399 F.3d 601, 612 (5th Cir. 2005) (holding that one two-hour "harangue" by a supervisor and use of a mocking tone on one occasion, and another supervisor's comment comparing the plaintiff to a "needy old girlfriend," did not amount to a severe or pervasive working environment); *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003) (finding occasional racial comments insufficient for a hostile work environment claim).

The cases Boutin cites in her response brief reinforce the insufficiency of her own harassment claim. In *Lauderdale v. Tex. Dep't of Crim. Justice*, 512 F.3d 157, 163-64 (5th Cir. 2007), the court found that the plaintiff had suffered pervasive harassment on the basis of sex when she received 10 to 15 phone calls per night and repeated sexual advances from her supervisor over

16

a four-month period.  Dorsey's behavior was less frequent and less egregious by several orders of magnitude.  In *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 805-06 (5th Cir. 1996), the plaintiff's supervisor made graphic comments to her about her sexual activity two to three times per week.  The comments focused on "attributing [the plaintiff's] large number of children to a proclivity to engage in sexual activity."  *Id.* at 805.  The comments included that the plaintiff "doesn't know how to use condoms" and that she was having sex with a boyfriend when he visited the office because there was a smell coming from her office.  The supervisor also often asked the plaintiff and her coworker "whether they had taken men home, and whether they 'got any.'"  *Id.* The court found the comments to be "egregious," holding that there was evidence to support a jury verdict that they were sufficiently severe *and* pervasive.  *Id.* at 806.  Dorsey's comments were far less severe, particularly because he did not make them to Boutin directly.

The parties also dispute whether Boutin acted reasonably in response to the harassment that she alleges occurred after April 2007.  Boutin states that she made complaints to ExxonMobil and Jacobs personnel, including supervisors.  Jacobs argues that it was Boutin's responsibility to escalate her complaints to Jacobs or ExxonMobil human resources officials if  harassment continued after her earlier complaints resulted in Dorsey being reprimanded and placed on probation.  Assuming without deciding that Boutin acted reasonably, she has still failed to identify or submit summary judgment evidence that creates a disputed fact issue material to her hostile work environment claim. The competent record evidence shows that as a matter of law, the harassment she alleges was not sufficiently severe or pervasive to affect the terms and conditions of her employment.

**B.**     **Sex Discrimination**

Boutin alleges sex discrimination in violation of Title VII, 42 U.S.C. § 2000e.  Disparate treatment, or intentional discrimination, can be proven by either direct or circumstantial evidence. *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 222 (5th Cir. 2000).  Evidence is "direct" if it would prove the fact in question without inference or presumption.  *Fabela v. Socorro Indep. Sch. Dist.,* 329 F.3d 409, 415 (5th Cir. 2003) (citations omitted).  If no direct evidence exists, the court uses the *McDonnell Dougla*s burden-shifting framework.  *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817.  Under *McDonnell Douglas,* a plaintiff alleging discrimination must first make a *prima facie* showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) an adverse employment action was taken; and (3) others similarly situated – but outside the protected group – were treated more favorably.  *See id.*; *Septimus v. Univ. of Houston,* 399 F.3d 601, 609 (5th Cir. 2005).  If the plaintiff makes the *prima facie* showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action.  *McDonnell Douglas,* 411 U.S. at 802.  If the defendant meets this burden, to defeat summary judgment, the plaintiff must present a genuine issue of material fact that: (1) the defendant's reason is not true, but is instead a pretext for discrimination; or (2) the defendant's reason, while true, is only one of the reasons for its conduct and discrimination was a motivating factor in the defendant's decision.  *See Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004); *see generally, Crawford v. U.S. Dept. of Homeland §.,* 245 F.App'x 369, 377-378 (5th Cir. 2007).  The pretext inquiry can be satisfied by a showing that Jacobs's proffered reason—debarment from the MBPP based on drugs—is not worthy of credence, or that some other reason is more likely.  *See Reeves,* 530 U.S. at 146-48.  In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision

18

would have been made regardless of discriminatory animus. *Rachid*, 376 F.3d at 312. The plaintiff has the ultimate burden of showing a genuine issue of material fact on whether the defendant discriminated on the basis of the plaintiff's membership in the protected class. *Reeves*, 530 U.S. at 143.

Boutin has produced no direct evidence of discrimination in the decision to fire her. To serve as direct evidence of an employer's discriminatory intent, a workplace comment must be "direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that [sex] was an impermissible factor in the decision to terminate the employee." *See Equal Employment Opportunity Comm'n v. Texas Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996). There is no evidence in the record of any sex-based statement or action by any person with influence over the decision to terminate Boutin's employment, let alone any statement that would permit a conclusion of discrimination without further inference. *Cf. Jones v. Overnite Transp. Co.*, 212 F.App'x 268, 273 (5th Cir. 2006) (per curiam) (unpublished) (finding no direct evidence of race discrimination despite evidence that a supervisor stated that he wanted to "get rid of all the blacks" and "fire a bunch of niggers" because although these comments revealed the supervisor's discriminatory animus, they "lack[ed] the indicia of specificity and causation required to be direct evidence of race discrimination.").

With no direct evidence of discriminatory intent, the analysis moves to the *McDonnell Douglas* burden-shifting framework. The first step is Boutin's *prima facie* case, in which she has the burden to show that: (1) she belongs to a protected group; (2) she was qualified for his position; (3) an adverse employment action was taken; and (4) others similarly situated outside the protected group were treated more favorably. *See McDonnell Douglas,* 411 U.S. at 802; *Alvarado v. Texas*

19

*Rangers*, 492 F.3d 605, 611 (5th Cir. 2007). Boutin belongs to a protected group because of her sex. There is no dispute that other than being barred from the premises, which she asserts was itself discriminatory, she was qualified for the job. There is also no dispute that Boutin's job termination was an adverse employment action. The core dispute is whether Boutin was treated less favorably than similarly situated men.

Boutin argues that K.A., a male, was treated more favorably than she was because Jacobs did not fire him when a handgun and ammunition were found in his car during the January 29 search. Jacobs argues that K.A. was not similarly situated to Boutin because ExxonMobil did not bar him from the MBPP, because the relevant disciplinary policies treated handguns and marijuana differently, and because Pettus did not have the authority to fire him.

The Fifth Circuit has stated that in analyzing disparate discipline claims, another employee is similarly situated to the plaintiff only if "the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by" the other employee. *Okoye v. Univ. of Texas Houston Health Science Center*, 245 F.3d 507, 514 (5th Cir. 2001) (quotations and alterations removed); *see Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) ("The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories" (footnotes omitted)); *Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir. 1990) ("Smith's burden is to show that the misconduct for which she was discharged was nearly identical to that engaged in by a male employee whom the company retained." (quotations and alterations

removed)); *see also Srail v. Village of Lisle, Ill.*, 588 F.3d 940, 945 (7th Cir. 2009) ("To be similarly situated, comparators must be prima facie identical in all relevant respects" (quotations omitted)).

The record shows that drug possession and handgun possession were not treated "nearly identical[ly]" by ExxonMobil's contractor policies.  The policy stated that a contractor-employee's first drug possession offense would result in the employee being permanently denied access to all ExxonMobil sites.  By contrast, a contractor-employee's first gun possession offense would result in only a three-day denial of access.  Under the clear meaning of this ExxonMobil policy, Boutin and K.A. were not similarly situated.  There is no evidence that K.A. had any previous firearm offense.  The evidence is that his offense and Boutin's offense were treated differently under the applicable ExxonMobil policy.

Boutin argues that under the Jacobs policy, she and K.A. were virtually identically situated. She argues that the Jacobs policy provides for discharge on a single drug offense or a single firearm offense.  But, as Jacobs notes, the policy does not state that.  The policy punishes possession of "*illegal* weapons or firearms" to the same extent as drug possession.  There is no evidence that the gun K.A. had in his car was illegal.  Moreover, the Jacobs policy refers to drug or weapon possession "on company premises."  It says nothing about how violations on the client's premises will be handled.  And the Jacobs policy states that "[i]f the client policies supersede these [Jacobs policies] then we must adhere to those guidelines."  (Docket Entry No. 47, Ex. 20).[1]  Regardless of the Jacobs policy on firing someone possessing contraband, under the applicable ExxonMobil policy, Boutin and K.A. were not similarly situated.  Under that policy, K.A. was permitted to access

---

[1]  Boutin states in a footnote that "Josh Lesher testified that the more stringent discipline is followed by Jacobs." (Docket Entry No. 47 at 27).  There is no support for that assertion in the excerpt of Lesher's deposition that Boutin submitted and cited.  (*Id.*, Ex. 22).

the MBPP and Boutin was not.  Boutin could not enter the facility where the job she had been hired

to do had to be performed.  If Jacobs had fired Boutin but retained a male employee who had been

barred from ExxonMobil sites because of weapons possession, the result would be different.  But

the undisputed facts in the record are that Boutin and K.A. were not similarly situated under the

relevant policies.  Moreover, after Boutin was fired, Jacobs hired a female employee to replace her.

To the extent Boutin argues she was similarly situated to the ExxonMobil employee who was

found to have marijuana during the January 29 search and was given the chance to take and pass a

drug test (which he refused to do) before being terminated, that argument is unpersuasive.

Contractors and ExxonMobil employees at the MBPP were subject to different rules.  The other

contractor employee—a male—who was found with marijuana the same day as Boutin was barred

from ExxonMobil's facilities immediately.

Additionally, the record shows that Pettus, the Jacobs supervisor who fired Boutin, did not

have authority to fire K.A.  Pettus did not have firing authority over K.A. because he was usually

assigned to a Bayer plant in Baytown with a different supervisor and was working at the MBPP only

to assist with the turnaround.  The Jacobs supervisor at the Bayer plant was the person who could

have fired K.A.  (Docket Entry No. 52, Ex. 8, Supp. Pettus Decl., ¶ 2).  The difference in

decisionmaker is an addition difference between K.A. and Boutin.  *See Lee*, 574 F.3d at 259

("Employees with different supervisors, who work for different divisions of a company . . .

generally will not be deemed similarly situated."); *Wyvill v. United Companies Life Ins. Co.*, 212

F.3d 296, 302-04 (5th Cir. 2000), *cert. denied*, 531 U.S. 1145 (2001) ("This court and others have

held that testimony from former employees who had different supervisors than the plaintiff, who

worked in different parts of the employer's company . . . cannot be probative of whether age was a determinative factor in the plaintiff's discharge.").

Even if Boutin made a *prima facie* showing, Jacobs has proffered Boutin's inability to enter ExxonMobil work sites and her drug violation as legitimate, nondiscriminatory reasons for her job termination.  The competent summary judgment evidence does not raise a fact issue about whether: (1) these reasons are not true, but are instead a pretext for discrimination; or (2) these reasons, while true, were only part of the reason Jacobs fired Boutin and discrimination was a motivating factor in the  decision.  *Rachid v. Jack in the Box*, *Inc.*, 376 F.3d 305, 312 (5th Cir. 2004); *Reeves v. Sanderson Plumbing Prods.*, *Inc.*, 530 U.S. at 141, 120 S. Ct. 2097.   Boutin has not created a fact issue material to determining whether her termination was pretextual because there is no summary judgment evidence of any male employee in a sufficiently similar situation who was treated more favorably.  K.A. and Boutin were not similarly situated because K.A. was subject to a different disciplinary policy under which he was still permitted to enter ExxonMobil's facility  and because different supervisors had firing authority over them.

The record also fails to raise a basis for inferring that Pettus, the person who fired Boutin, had any animus toward female employees.  Pettus had selected Boutin for the Catalyst Yardmaster position over male applicants and also selected a female to replace Boutin after he fired her.  The Fifth Circuit has adopted the "same-actor rule."  Under this rule, when the person who hires the plaintiff later decides to fire her, there is an "inference that [] discrimination was not the motive behind [the] termination."  *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996), *abrogated on other grounds by Reeves*, 530 U.S. at 151, 120 S. Ct. 2097.  In explaining the reasoning behind the rule, the *Brown* court quoted the Fourth Circuit as follows:

"[c]laims that employer animus exists in termination but not in hiring seem irrational." From the standpoint of the putative discriminator, "[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job."

*Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) (quoting John J. Donohue III & Peter Siegelman,

*The Changing Nature of Employment Discrimination Litigation*, 43 STAN. L. REV. 983, 1017

(1991)); *see also Spears v. Patterson UTI Drilling Co.*, 337 F.App'x 416, 421-22 (5th Cir. 2009)

(per curiam) (unpublished) ("The same actor inference creates a presumption that animus was not

present where the same actor responsible for the adverse employment action either hired or

promoted the employee at issue.").  There is no evidence in the record to rebut the same-actor

inference, which clearly applies to the facts of this case.  Pettus hired Boutin instead of four male

candidates and was  the one who fired her.  He then hired a female to replace Boutin.

The only evidence of sex-based animus in the record is that of Dorsey, an ExxonMobil

employee.  There is no evidence that Dorsey had any influence or over Pettus, Roberts, the Jacobs

human resources official Pettus consulted, or Davis, the ExxonMobil employee who barred Boutin

from the MBPP.  A plaintiff arguing that workplace remarks are circumstantial evidence of

discrimination in firing must identify or present evidence that the remarks demonstrate

discriminatory animus on the part of a person either primarily responsible for the firing or a person

with influence or leverage over the decisionmaker.  There is no evidence that Dorsey had any

influence or role in the decision to fire Boutin.  *See Laxton,* 333 F.3d at 583; *Russell*, 235 F.3d at

225; *see also Phillips v. TXU Corp.*, 194 F. App'x 221, 228 (5th Cir. 2006) (per curiam)

(unpublished) (holding that "[a] remark is considered probative of discrimination if it demonstrates

24

discriminatory animus and was made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decisionmaker.").

Boutin argues that Jacobs's explanation for her firing should not be credited because Interquest did not perform a sufficiently thorough investigation of her vehicle. She claims, in effect, that there is no evidence that marijuana was actually found in her car. But it is undisputed that Interquest reported to ExxonMobil that it had found marijuana and that ExxonMobil reported this information to Pettus along with the result that Boutin was barred from the premises. Boutin's argument is foreclosed by the record and the case law. "Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007); *see also  Mire v. Texas Plumbing Supply Co., Inc.*, 286 F. App'x 138, 143–44 (5th Cir. 2008) (unpublished) (per curiam) (holding that the plaintiff's subjective belief that she was right and defendant was wrong, without more, was insufficient to rebut defendant's reasons for the disciplinary action); *Bryant v. Compass Group USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (stating that the fact that an employer's investigation reaches the wrong conclusion does not show an improper motivation); *Cervantez v. KMGP Services Co., Inc.*, No. 08-11196, Slip Op. at  8-9 (5th Cir. Sep. 16, 2009) (unpublished) (per curiam) ("[A] fired employee's actual innocence of his employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted in good faith.").

Boutin has not raised a genuine issue of disputed fact material to determining whether she was fired because of her sex. Jacobs is entitled to summary judgment on the disparate treatment claim.

## C.    Retaliation

The *McDonnell Douglas* burden-shifting framework also applies to retaliation claims. *See Mota v. Univ. of Texas Houston Health Science Center*, 261 F.3d 512, 519-20 (5th Cir. 2001); *McDonnell Douglas Corp.,* 411 U.S. at 802. If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate rationale for the underlying employment action. The burden then shifts back to the plaintiff to show that the employer's articulated reason for the employment action was a pretext for retaliation. *Mota*, 261 F.3d at 519-20. The standard of proof on the pretext element of a Title VII retaliation claim is that the adverse employment action taken against the plaintiff would not have occurred "but for" her protected conduct. *Septimus v. Univ. of Houston*, 399 F.3d 601 (5th Cir. 2005); *Pineda v. United Parcel Serv., Inc*., 360 F.3d 483, 487 (5th Cir. 2004).

The elements of a *prima facie* retaliation claim are that: (1) the plaintiff engaged in an activity protected by the statute; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007). Title VII's antiretaliation provision encompasses two broad types of protected activity, making it "an unlawful employment practice for an employer to discriminate against any of his employees . . . [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

The Supreme Court recently clarified in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405 (2006), that an "adverse employment action" in the retaliation context, is an action that "a reasonable employee would have found . . . [to be] materially adverse, which in

this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotations omitted). Job termination is clearly an adverse employment action.

In the present case, the parties do not dispute the first two elements of the *prima facie* case. The issue is whether there is a sufficient causal link between Boutin's complaints about Dorsey and her termination. The causal link required for a *prima facie* showing of retaliation does not rise to the level of a "but for" standard. *Gee*, 289 F.3d at 345. A "causal link" for a *prima facie* showing is present if evidence shows that "the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001). "Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997). The Supreme Court has noted that "cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S. Ct. 1508 (2001). The Fifth Circuit has found temporal proximity of up to four months sufficient for a *prima facie* showing of a causal link. *See, e.g., Bell v. Bank of Am.*, 171 F.App'x 442, 444 (5th Cir. 2006) (per curiam) (unpublished) (holding that a seven-month period does not support a causal link); *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471-72 (5th Cir. 2002) (holding that a five-month period does not support an inference of a causal link); *Harvey v. Stringer*, 113 F.App'x 629, 631 (5th Cir. 2004) (per curiam) (unpublished) (finding that a ten-month period did not create a causal link); *Stroud v. BMC Software, Inc.*, No. 07-20779, 2008 WL 2325639 (5th Cir. Jun. 6, 2008) (per curiam) (unpublished)

(finding that a three-week lapse between protected activity and adverse employment action was sufficient to show a causal link); *Richard v. Cingular Wireless LLC*, 233 F.App'x 334, 338 (5th Cir. 2007) (per curiam) (unpublished) (concluding that two-and-one-half months is a short enough period to support an inference of a causal link); *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 995 (5th Cir. 2005) (finding that a period of less than sixty days was sufficiently close to establish causal link for *prima facie* case of retaliation); *Ware v. CLECO Power LLC*, 90 F. App'x 705, 708 (5th Cir. 2004) (unpublished) (fifteen days is sufficient); *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir.2001) (finding that "a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes" (internal citations omitted)).

The formal complaints Boutin made about Dorsey in February 2007 were nearly a full year before her job termination and do not support her *prima facie* case. There is evidence in the record that Boutin continued to make complaints about Dorsey, including as late as "near the end of 2007," when she complained to Bill Gifford about Dorsey's failure to move the tank of catalyst. Despite the lack of specificity, this complaint appears to be sufficiently close to Boutin's termination to support a showing of causation under the case law. It is unclear, however, whether this complaint qualifies as protected activity because there is no evidence that the complaint characterized Dorsey's conduct as sex-based harassment. Boutin's deposition testimony also casts doubt on her retaliation claim. She testified that, to her, retaliate means "to get back." (Docket Entry No. 26, Ex. 1, Boutin Depo. at 125). Immediately following that, she stated: "I'm not saying they retaliated. I'm saying they resolved the problem." (*Id.* at 126). Boutin explained her view that she was fired because of her interpersonal conflict with Dorsey and the fact that she was easier to fire than he was because she was a contractor. Assuming without deciding that this is sufficient evidence to create a factual

issue on the causation element of Boutin's *prima facie* case, her claim still cannot survive summary judgment because the record does not show a disputed fact issue material to determining whether she would have been fired but for her protected conduct.  *Septimus*, 399 F.3d at 607; *Pineda v. United Parcel Serv.*, *Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).   The plaintiff can meet this burden "by producing circumstantial evidence sufficient to create a fact issue as to whether the employer's nondiscriminatory reasons are merely pretext for discrimination." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005).  In *Reeves*, the Supreme Court stated that "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." 530 U.S. at 143.  A plaintiff may show pretext by demonstrating that the proffered reasons for the challenged employment action are false or "unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003); *Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002) (stating that an employer's inconsistent explanations for its employment decisions at different times permit a jury to infer that the employer's proffered reasons are pretextual).  If the plaintiff can identify evidence the proffered explanation is merely pretextual, that will usually be sufficient to survive summary judgment. *Reeves*, 530 U.S. at 146-48.

Boutin's scant evidence of temporal proximity by itself is insufficient to raise a fact issue as to but for causation.  Boutin offers the same arguments and evidence of disparate discipline she made in connection with her sex discrimination claim.  The undisputed evidence shows no similarly situated employee who did not file a complaint and was not fired.  Even assuming that K.A. had not filed a complaint about workplace harassment, he was not similarly situated to Boutin because the relevant policies treated weapons and drugs differently, he was not barred from the premises, and

he could not be fired by Pettus.  And Boutin's argument that there was not sufficient evidence that the substance in her car was marijuana does not create a fact issue on pretext when there is no evidence that Pettus had a  good faith and reasonable basis for believing the report he had received from the investigator.  *See LaMaire*, 480 F.3d at 391 ("Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext"); *Bryant*, 413 F.3d at 478 (stating that the fact that an employer's investigation reaches the wrong conclusion does not show an improper motivation); *Cervantez*, No. 08-11196, Slip Op. at  8-9 ("[A] fired employee's actual innocence of his employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted in good faith.").

The record does not show a genuine issue of fact material to resolving Boutin's retaliation claim.  Jacobs is entitled to summary judgment.

## IV.    ExxonMobil's Motion for Summary Judgment

The threshold issue is whether ExxonMobil can be considered Boutin's employer for Title VII purposes.  Title VII permits suits only against "employers," "employment agencies," and "labor organizations."  *See* 42 U.S.C. § 2000e-2 (establishing "unlawful employment practices"); *Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 616 (5th Cir. 1999).  It is undisputed that Boutin was a Jacobs employee.  Boutin argues that ExxonMobil was her "joint employer."

Boutin argues that this court should borrow from labor relations case law and adopt the Fifth Circuit's joint-employer standard from *North American Soccer League v. NLRB*, 613 F.2d 1379, 1382 (5th Cir. 1980).  Under that standard, "[t]he existence of a joint employer relationship depends on the control which one employer exercises, or potentially exercises, over the labor relations policy of the other."  *Id.*  Courts have applied this test in Title VII cases.  *See, e.g., Bristol v. Bd. of County*

*Commissioners*, 312 F.3d 1213, 1218-19 (10th Cir. 2002); *Graves v. Lowery*, 117 F.3d 723, 727-30 (3d Cir. 1997); *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1359 n.6 (11th Cir. 1994).  In *Jones v. Norfolk S. Co.*, 348 F.App'x 970, 973 (5th Cir. 2009) (per curiam) (unpublished), the court upheld the district court's use of the *North American Soccer League* standard in a Title VII analysis on the grounds that the plaintiff (who was alleging error) asked the district court to apply that standard and had thus forfeited her right to challenge it.  *Id.*  The court also observed that the result—a finding that the defendant was not the plaintiffs' joint employer—would be no different under the integrated-enterprise test urged by the plaintiff.  *Id.*  The integrated-enterprise test requires looking at four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Trevino v. Celanese Corp.*, 701 F.2d 397, 403-04 (5th Cir. 1983).  In *Jones,* the court did not decide which test should apply because the plaintiff had not shown a joint employment relationship under either standard.  *Jones*, 348 F.App'x at 973.

The Fifth Circuit has suggested that the joint-employer standard is appropriate in some Title VII cases.  *See Turner*, 476 F.3d at 344-45 ("Because Turner did not raise the joint-employer theory of liability until her motion for new trial, the district court did not err in deeming it waived. Further, this argument clearly lacks merit, as Turner has made no showing that the Foundation retained for itself sufficient control of the terms and conditions of Turner's employment." (quotations and alterations removed)).  The integrated-enterprise test is not a good fit for a case involving one company with a service contract with the other, as opposed to affiliated or related companies such as a parent and subsidiary.  This court applies the joint-employer test that Boutin urges.

31

A company may be a joint employer when it, "while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *Virgo*, 30 F.3d at 1360. The entities may be separate—not an integrated enterprise—but they "share or co-determine those matters governing the essential terms and conditions of employment." *Id.* Boutin points to a Second Circuit labor relations case providing practical guidance in applying this standard. In that case, *AT&T v. NLRB*, 67 F.3d 446 (2d Cir. 1995), the issue was whether AT&T was a joint employer of unionized employees of the contractor AT&T hired to provide cleaning services in one of its buildings. The court identified five factors to be weighed: "whether the alleged joint employer (1) did the hiring and firing; (2) directly administered any disciplinary procedures; (3) maintained records of hours, handled the payroll, or provided insurance; (4) directly supervised the employees; or (5) participated in the collective bargaining process." *Id.* at 451 (citing *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 138 (2d Cir. 1985)). Applying the Second Circuit's factors to the present record shows that as a matter of law, ExxonMobil was not Boutin's joint employer.

The first factor is whether ExxonMobil "did the hiring and firing." Boutin was both hired and fired by Pettus, a Jacobs employee. Boutin argues that ExxonMobil was involved in approving her promotion to Catalyst Yardmaster. She testified in her deposition that in addition to interviewing with Pettus, she was required to interview with Kris Fields of ExxonMobil. Boutin also testified that Pettus spoke with some ExxonMobil employees to determine whether she was qualified for the promotion. Boutin testified that she did not know who made the promotion

decision.[2]  (Docket Entry No. 39, Ex. 1, Boutin Depo. at 24-26).  Pettus stated in his declaration that

he "selected Ms. Boutin for the job."  (Docket Entry No. 45, Ex. 6, Pettus Decl., ¶ 5).  He also stated

that he selected Boutin's replacement because he personally believed she was the most qualified.

(*Id.*, ¶ 13).  Boutin also argues that ExxonMobil "demanded" that she be fired.  There is no evidence

of this other than Boutin's testimony that Josh Lesher, a Jacobs employee, told her that an unknown

ExxonMobil employee told him that Jacobs "had to fire" Boutin.  (Docket Entry No. 39, Ex. 1,

Boutin Dep. at 74, 90).  This is hearsay within hearsay without any basis for admission.  Boutin

cannot show that this unidentified ExxonMobil person satisfied the requirements for party-opponent

statements under Federal Rule of Evidence 801(d)(2).  And Lesher's statement also fails to satisfy

Rule 801(d)(2) because he was not speaking for ExxonMobil.  Moreover, the statement is entirely

consistent with Jacobs "having" to fire Boutin without any involvement by ExxonMobil because she

was not able to enter the MBPP.  The competent evidence is that ExxonMobil informed Pettus that

Boutin would be barred from ExxonMobil sites because of the ExxonMobil policy that applied to

contractor employees, not its own employees.  After consulting with a Jacobs human resources

official, Pettus decided to fire Boutin.  The first of the *AT&T* factors weighs against finding that

ExxonMobil was Boutin's employer.

The second factor is whether ExxonMobil "directly administered any disciplinary

procedures."  There is no evidence that ExxonMobil directly disciplined Boutin or any other Jacobs

employee.  ExxonMobil informed Jacobs that Boutin was barred from the MBPP and other facilities,

---

[2]  Boutin also testified that Pettus told her that it was ExxonMobil's decision, not Pettus's, that would
determine who was selected for the Catalyst Yardmaster position.  (Docket Entry No. 39, Ex. 1, Boutin Depo.
at 25).  This is hearsay.  It is not admissible as a party-opponent statement because Pettus is not an
ExxonMobil employee and there is no evidence that he was authorized to make such statements on behalf
of ExxonMobil.  *See* FED. R. EVID. 801(d)(2).

which it was entitled to do under the contract.  The disciplinary action, termination, was taken by Jacobs.  In *Jones*, 348 F.App'x at 973, after stating that it would not decide whether the joint-employer test was proper, the Fifth Circuit concluded that the facts of the case would not have satisfied that test.  In that case, as here, a contractor provided employees to work at another company's premises.  The court held that the premises owner's "'power' over [the contractor's] employees was limited to barring [those] employees from the . . . facility.  "This 'power,' the court stated, "is insufficient to transform [the premises owner] into [the plaintiff's] employer for Title VII purposes."  *Id.*  Similarly, ExxonMobil's policy barring from the premises a contractor's employees who violated certain work rules does not as a matter of law make ExxonMobil a joint employer of the contractor's employees.  The second *AT&T* factor also weighs against finding that ExxonMobil was a joint employer.

The third factor is whether ExxonMobil "maintained records of hours, handled the payroll, or provided insurance."  There is no evidence that ExxonMobil did any of these things.  Although there is evidence that ExxonMobil supervisors signed Boutin's time sheets before she turned them in, Jacobs was responsible for keeping the records, paying Boutin, paying her payroll taxes, and providing benefits.  The third factor weighs against finding ExxonMobil to be Boutin's employer.

The fourth factor is whether ExxonMobil "directly supervised" Boutin.  In her deposition, Boutin testified that ExxonMobil personnel trained her for the Catalyst Yardmaster position, approved her for certain job duties, set her daily schedule, approved her raises, and required that she cleared her vacation dates with ExxonMobil before submitting them to Jacobs.  But, as the court in *AT&T* stated, "[l]imited and routine supervision, without an ability to hire, fire, or discipline, cannot

justify a finding of joint employer status." *AT&T*, 67 F.3d at 452.  That language describes the facts of this case well.

Boutin's employment was supervised by Pettus, Jacobs's on-site supervisor.  Boutin worked a different schedule than the ExxonMobil employees.  Bill Gifford of ExxonMobil, who Boutin states was her "supervisor," testified in his deposition that he did not supervise Boutin or any contractor personnel but rather "the process of making catalyst."  (Docket Entry No. 39, Ex. 3, Gifford Depo. at 9).  The record shows that the training ExxonMobil provided to Boutin was on the Catalyst Department operations and safety requirements and the Department of Transportation regulations.  There is also evidence that Boutin received training conducted by Jacobs.  Gifford testified in his deposition that his training was designed to show Boutin "how the process works." (*Id.* at 71).  Josh Lesher testified that Boutin's initial training was done by Katy Belcher, the Jacobs training coordinator.  (Docket Entry No. 44, Ex. 8, Lesher Depo. at 106).  Belcher testified that ExxonMobil gave Boutin "procedural training" in addition to the training carried out by Jacobs. (Docket Entry No. 39, Ex. 4, Belcher Depo. at 18-19).  There is no dispute that Belcher oversaw all Boutin's training.

Gifford also described Boutin's daily working arrangement in his declaration.  He stated as follows:

> Ms. Boutin worked a straight schedule, arriving between 7:00 and 7:30 a.m. and leaving around 4:30 p.m. Monday through Friday. This schedule was driven by when delivery trucks arrived at the MBPP to deliver or retrieve tanks.
>
> Beyond telling Ms. Boutin when pick-ups and deliveries would occur, ExxonMobil did not dictate how she arranged her work. Such matters were left to Ms. Boutin's discretion. All ExxonMobil expected was that Ms. Boutin would prepare the required containers on a safe and timely basis.

> ExxonMobil could approve how much Jacobs charged for Ms.
> Boutin's labor.   ExxonMobil did not decide how much Jacobs
> actually paid Ms. Boutin.

(Docket Entry No. 44, Ex. 7, Gifford Depo., ¶¶ 4-6).

The undisputed competent record evidence shows that to the extent ExxonMobil supervised Boutin, it was to ensure that the contract with Jacobs was performed as required.  Cases applying the joint-employer analysis in the FLSA context make clear that this type of supervision does not justify finding a joint-employer relationship.  *See Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003) ("By contrast, supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement."); *Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2004) (finding that a general contractor was not a joint employer of a subcontractor's employees when the instructions given to the employees concerned performance of the subcontract); *Quintanilla v. A&R Demolition, Inc.*, No. H-04-1965, 2005 WL 2095104, at *11 (S.D. Tex. Aug. 30, 2005) (holding that there was no fact issue as to whether the general contractor was the joint employer of the subcontractor's employees because "the allocation of supervision and related tasks . . . [was] consistent with such a relationship.").  The fourth factor also weighs against finding that ExxonMobil was Boutin's joint employer.

The final factor is whether ExxonMobil participated in Jacobs's collective-bargaining process.  There is no evidence or suggestion that ExxonMobil was involved in any such process.  Considering all the factors leads to the conclusion that the relationship between ExxonMobil and Jacobs with respect to Boutin was consistent with the parties' contract providing that Jacobs was

responsible for controlling, supervising, and compensating its own employees.  Boutin has not created a fact issue material to determining whether ExxonMobil was her joint employer.

ExxonMobil is entitled to summary judgment on the basis that it was not Boutin's employer. In addition, the same reasons that led to summary judgment in favor of Jacobs would also require summary judgment on the merits of Boutin's claims against  ExxonMobil.

## V.    Conclusion

Both motions for summary judgment are granted.  Final judgment is entered by separate order.

SIGNED on July 30, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge